

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00243-CR

Emery Jay **MENCHACA**, Jr.,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 218th Judicial District Court, Atascosa County, Texas
Trial Court No. 20-06-0138-CRA
Honorable Lynn Ellison, Judge Presiding

Opinion by:  Lori I. Valenzuela, Justice

Sitting:  Rebeca C. Martinez, Chief Justice
Lori I. Valenzuela, Justice
Sandee Bryan Marion, Chief Justice (Ret.)[1]

Delivered and Filed: July 5, 2023

AFFIRMED

Appellant, Emery Jay Menchaca, Jr., was charged with entering a habitation and committing or attempting to commit a felony—aggravated assault and assault family violence (strangulation). A jury found him guilty as charged and sentenced him to seventy years' confinement. In twelve issues on appeal, Menchaca challenges various evidentiary rulings by the trial court. We affirm.

---

[1] The Honorable Sandee Bryan Marion, Chief Justice (Ret.) of the Fourth Court of Appeals, sitting by assignment of the Chief Justice of the Texas Supreme Court. *See* TEX. GOV'T CODE §§ 74.003, 75.002, 75.003.

## BACKGROUND[2]

Menchaca's wife ("Brooke") testified she has dated Menchaca over the past twelve years and their relationship has been "toxic." She first met Menchaca when they were both in middle school and they dated "on and off again" through high school. She stated she has three children aged twelve, eight, and six years old. She gave birth to her first child when she was a sixteen-year-old sophomore in high school, and another young man is the child's father. Menchaca is the father of Brooke's two youngest children, both sons. Menchaca and Brooke married in March 2018. That same year, the couple discussed getting a divorce. Brooke filed for divorce in August 2018. Toward the end of December 2020, Brooke began dating AJ Cordova. She said Menchaca was "not happy" that she was dating AJ. However, she admitted there were times she and Menchaca talked about getting back together.

On April 17, 2020, Brooke left her place of employment at around 5:00 p.m. and went to AJ's house. She said Menchaca had called her throughout the day at her workplace and after work. At the time, he had their sons with him. She said when she returned Menchaca's calls, he yelled at her and told her she needed to go home and "if [she] wasn't going to go home on [her] own, he was going to come get [her.]" He also told her that he would come get her and take her and the kids "where no one would find us." She interpreted Menchaca's statement to mean he was going to do something to hurt her or the children. Because she felt threatened, she called the sheriff's office for a welfare check on her children.

When she was at AJ's house, she called 911 but ended the call when Menchaca arrived. She described what happened on the evening of April 17th as follows:

---

[2] Several witnesses testified during the guilt/innocence and punishment phases of trial. However, Menchaca's issues on appeal all relate to evidentiary rulings. None relate to the sufficiency of the evidence. Therefore, this Background section is provided only to give context to some of those rulings and the arguments made on appeal.

A. I was in [AJ's] living room and I heard [Menchaca's] truck. It's a very loud truck. And I ran into the bedroom. I looked out the window and I saw his truck parked at the cemetery, and then I saw him running down the driveway, down the road.

Q. I mean, were you able to see him clearly? Can you say for sure it was [Menchaca]?

A. Yes.

Q. When you saw him coming down the driveway and you ended that 911 call, what happened next?

A. I – I saw him running around the house to the front door and the back door. And it was dark. All the lights were out in the house. Me and AJ were standing next to the bed, and I just heard – I thought the window was shot out, but I guess a hammer went through it. And as soon as I heard the glass break, I took out running – took off running out the front door.

Q. Let's talk about when you saw him running around the house. You say he went to the front door and back door. How do you know that? Did you hear anything?

A. I saw him through the windows.

Q. Okay. When you said you thought it was a gunshot, why – why was that?

A. Just because it was so loud.

Q. What was going through your head at that moment?

A. That if I didn't get away he was going to kill AJ.

Q. So you were worried about AJ at that point?

A. (Nodding.)

Q. And so what did you do?

A. I took off running out of the bedroom and out the front door, down the street, thinking that the cops would be there.

Q. Were you able to get all the way down the road?

A. No.

Q. What happened next?

A. I don't know if [Menchaca] pulled me down. I don't know how. I just remember being on the ground and being striked [sic] multiple times.

Q. Can you tell the jury what he was doing exactly, what you – to the best that you can remember?

A. I just remember being punched in the head and the face consistently.

Q. What happened next?

A. Somehow I got from the street in between the window where he'd broke it out. I just remember laying on glass and [Menchaca] was leaning over me and looking in his eyes. I couldn't feel anything. Like, he had his fingers down my throat and he was biting me.

Q. When he had his fingers down your throat, can you describe that for the jury?

A. I just felt his hand down my throat with – like he had gloves on or something.

Q. What do you remember about the gloves?

A. They just felt like a fabric, cloth.

Q. And you said he was biting you. Was that while he had his hands down your throat?

A. Yes.

Q. With his hands down your throat, were you able to breathe?
A. No.

Somehow, Brooke was not sure how, she and Menchaca ended up at the back of AJ's house where Menchaca continued to beat her, telling her "I'm not going to stop. You're going to die tonight." "He said me and my kids." At some point, Menchaca ran away. Brooke said Menchaca must have entered AJ's house for him to have chased her out the front door.

The jury found Menchaca guilty of "intentionally and knowingly enter[ing] a habitation, without the effective consent of . . . the owner thereof, and attempt[ting] to commit or committed the felony offense of Aggravated Assault and Assault Family Violence by Impeding Breath." On appeal, Menchaca raises twelve issues complaining of the trial court's evidentiary rulings.

## STANDARD OF REVIEW

We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). A trial court abuses its discretion when its decision falls outside the zone of reasonable disagreement. *See id.* An appellate court must uphold the trial court's ruling if it is reasonably supported by the evidence and is correct under any applicable theory of law. *See Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002).

## HEARSAY

In his first, second, and third issues, Menchaca asserts the trial court abused its discretion by admitting hearsay evidence of alleged extraneous offenses. In his sixth issue, Menchaca asserts the trial court erred by admitting hearsay testimony about a conversation between Brooke and defense counsel.

Hearsay is inadmissible except as provided by statute or the rules of evidence. *See* TEX. R. EVID. 802. Hearsay is defined as an oral or written "statement that (1) the declarant does not

make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." *Id.* 801(d). "Matter asserted" means "(1) any matter a declarant expressly asserts; and (2) any matter implied by a statement, if the probative value of the statement as offered flows from the declarant's belief about the matter." *Id.* 801(c). "It is well settled that an out-of-court 'statement' need not be directly quoted in order to run afoul of the hearsay rules." *Head v. State*, 4 S.W.3d 258, 261 (Tex. Crim. App. 1999)

## A.    Screenshot of a Text Message

In his first issue, Menchaca complains about the admission of an exhibit containing a screenshot of a text message from Menchaca to his brother that was proffered during Brooke's testimony. On appeal, Menchaca asserts the hearsay went directly to whether he was abusive. The State responds that the statements in the text message were admissible under the admissions by a party opponent exception to the hearsay rule.

Statements that constitute admissions by a party opponent, including a party's own statement, are not hearsay. *See* TEX. R. EVID. 801(e)(2)(A). On appeal, Menchaca does not dispute that the text message was written by him to his brother. His sole argument is that the screenshot of the text should not have been admitted because the statements contained in the text message were of a highly prejudicial nature that cannot be considered to "not influence or had only a slight influence" in deciding the jury's verdict. We agree with the State that the statements made by Menchaca in the text message were admissions by a party opponent, and, therefore, not hearsay.

Menchaca also contends the screenshot was prejudicial. Even if prejudicial, we conclude the screenshot was not unfairly prejudicial. Under Rule of Evidence 403, a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. "Rule 403 does not require

exclusion of evidence simply because it creates prejudice; the prejudice must be 'unfair.'" *Martinez v. State*, 327 S.W.3d 727, 737 (Tex. Crim. App. 2010). Assuming without deciding that the screenshot was prejudicial to Menchaca, we hold it was not unfairly prejudicial.

"The danger of unfair prejudice exists only when the evidence has the 'potential to impress the jury in an irrational way.'" *Id.* (citation omitted). That was not the case here. During the guilt-innocence phase, the jury heard evidence about Menchaca's and Brooke's abusive relationship and about the violent nature of the assault committed by Menchaca on the night of the incident. The State did not mention the screenshot in its closing argument. *Id.* ("Although the State elicited the information from Burch, it was never mentioned again and was not relied upon by the State during its closing argument."). Therefore, we conclude the trial court did not abuse its discretion by allowing the screenshot into evidence. We overrule Menchaca's first issue.

**B.      Menchaca's Alleged Sexual Assault of Brooke**

In his second and third issues, Menchaca complains about the admission into evidence of an extraneous offense. Specifically, Brooke's testimony regarding Menchaca's alleged sexual assault of her and the testimony of Brooke's mother ("Christie") regarding the reaction of Brooke's two young sons to what happened.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion sufficiently stating the specific grounds, if not apparent from the context, for the desired ruling. *See* TEX. R. APP. P. 33.1(a)(1); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021). To avoid waiving a complaint on appeal, the party must "let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in a position to do something about it.'" *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) (citation omitted). "This gives the trial judge and the opposing party the opportunity to correct the error." *Montelongo*, 623 S.W.3d

at 822. Further, the party must obtain an express or implicit adverse trial-court ruling or object to the trial court's refusal to rule. *See* TEX. R. APP. P. 33.1(a)(2); *Dixon v. State*, 595 S.W.3d 216, 223 (Tex. Crim. App. 2020). In both instances here, defense counsel's objection came after several questions had been asked and responses had been elicited during Brooke's and Christie's testimony. Therefore, Menchaca's second and third issues are waived and present nothing for review.

## C.      Brooke's Conversation with Defense Counsel

In his sixth issue, Menchaca asserts the trial court abused its discretion by admitting Brooke's testimony about a conversation she had with defense counsel because the testimony constituted hearsay evidence that was irrelevant.

During the State's direct examination of Brooke, she admitted there was a time when she did not want to proceed with the case against Menchaca and she asked the State not to prosecute him. She admitted she had contacted the defense attorney wanting to help with Menchaca's case. During cross-examination, the following questions were asked of Brooke by defense counsel:

> Q. And, you know, the – Mr. Thornton [the prosecutor] asked you earlier if you spoke to me about this –
> A. Yes.
> Q. – right?
> Do you remember talking to me?
> A. Yes.
> Q. Do you remember telling me that you were under so many drugs and medications that you didn't know whether it was AJ that attacked you? Didn't you tell me that?
> A. I've had a lot of mixed emotions. I know AJ did not do this.
> Q. But didn't you tell me that you weren't sure whether it was AJ that attacked you or not? You told me that, didn't you?
> A. I feel like I was being pressured into saying certain things.
> Q. You feel you were being pressured into saying that AJ –
> A. I didn't say that AJ did this to me. I don't remember saying that.
> Q. You don't remember telling me that you didn't know who did it to you and that it could have been AJ?
> A. Don't remember saying that.
> . . .

Later, on re-direct by the State, Brooke was asked the following:

Q. The defense attorney also asked you some questions about the – the things you told him on the phone. Do you remember when he was asking you about that?
A. Uh-huh. Yes.
Q. And how you said that you can't say for sure it was [Menchaca] or AJ.
A. Yes.
Q. You – you told the jury that you felt like you were being pressured. Can you describe what you mean by that to the jury?
A. Just some of the things that was [sic] said to me that – about avoiding getting served so I didn't have to testify.
Q. And who told you that?
A. [Menchaca's] attorney.
Q. So the man who was asking you questions?

On appeal, Menchaca asserts Brooke's conversation with defense counsel amounted to hearsay and was not relevant to the elements of the case against him. Menchaca does not explain what "truth" Brooke's statements were meant to "prove" or how he may have been harmed if the court erred by allowing the testimony. And we will not speculate. Menchaca's brief does not include any substantive analysis applying Rule 801 to the facts of the case or explain why Rule 802 required the exclusion of the evidence. Accordingly, this complaint is inadequately briefed and presents nothing for our review. *See Swearingen v. State*, 101 S.W.3d 89, 100 (Tex. Crim. App. 2003) (holding failure to adequately brief issue waives any error).

## AUTHENTICATION

At trial, "[t]he court must decide any preliminary question about whether . . . evidence is admissible." TEX. R. EVID. 104(a). A "condition of admissibility of evidence in any legal contest is its relevance to an issue in the case—that is to say, its tendency to make a fact of consequence to determination of the action more or less probable." *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). "Evidence has no relevance if it is not authentically what its proponent claims it to be." *Id.* "In so deciding, the court is not bound by evidence rules, except those on privilege." *Id.*

Rule 901 provides that "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is[, including] evidence that satisfies the [following] requirement: [a]ny method of authentication or identification allowed by a statute or other rule prescribed under statutory authority." TEX. R. EVID. 901(a),(b)(10). Among the methods of authentication is self-authentication as provided under Rule of Evidence 902, which states that certain "items of evidence are self-authenticating; they require no extrinsic evidence of authenticity in order to be admitted[, including] [a] copy of an official record—or a copy of a document that was recorded or filed in a public office as authorized by law—if the copy is certified as correct by: (A) the custodian or another person authorized to make the certification; or (B) a certificate that complies with Rule 902(1), (2), or (3), a statute, or a rule prescribed under statutory authority." *Id.* 902(4).

"Whether the proponent has crossed [the] threshold . . . required by Rule 901 is one of the preliminary questions of admissibility contemplated by Rule 104(a)." *Tienda*, 358 S.W.3d at 638. "The trial court should admit proffered evidence 'upon, or subject to the introduction of evidence sufficient to support a finding of' authenticity." *Id.* The ultimate question whether an item of evidence is what its proponent claims is a question for the jury in a jury trial. *Id.* "The preliminary question for the trial court to decide is simply whether the proponent of the evidence has supplied facts that are sufficient to support a reasonable jury determination that the evidence he has proffered is authentic." *Id.* The trial court does not abuse its discretion in admitting evidence where it reasonably believes a reasonable juror could find that the evidence has been authenticated or identified. *Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007).

**A. Brooke's Social Media Posts**

In his fourth issue, Menchaca asserts the trial court erred by admitting into evidence two photographs that Brooke posted on social media on the ground that the photographs were not properly authenticated. The photographs were of AJ and her son.

On appeal, Menchaca merely contends "insufficient specificity was provided for a trier of fact to authenticate the photographs." We disagree. The testimony of a witness with knowledge "that an item is what it is claimed to be" is sufficient to authenticate an item. TEX. R. EVID. 901(b)(1); *see Tienda*, 358 S.W.3d at 640 (a witness might have "knowledge" of the authorship of a text message for a number of reasons, one being that the witness is the actual author of the text message). Brooke testified she took the photographs in question and she posted them to Facebook. We conclude it was reasonable for the trial court to believe that a reasonable juror could find that the exhibits were what the State purported them to be—photographs of Brooke's boyfriend and her son. The photographs were properly authenticated, and the trial court's decision to admit them was not an abuse of discretion. We overrule Menchaca's fourth issue.

**B. Photographs of Menchaca's Truck's Vehicle Registration**

In his eighth issue, Menchaca asserts the trial court erred by admitting into evidence a photograph of a Texas Department of Motor Vehicles registration on the ground that it was not self-authenticating. At trial, the State attempted to admit into evidence the registration for the purpose of showing Menchaca owned the named vehicle, a truck. Defense counsel objected that the exhibit was not properly authenticated.

In addition to the rules cited above, as to proof of the contents of a writing, apart from its authentication, Rule of Evidence 1005 provides as follows:

> The proponent may use a copy to prove the content of an official record—or of a document that was recorded or filed in a public office as authorized by law—if these conditions are met: the record or document is otherwise admissible; and *the*

*copy is certified as correct in accordance with Rule 902(4)* or is testified to be correct by a witness who has compared it with the original. If no such copy can be obtained by reasonable diligence, then the proponent may use other evidence to prove the content.

TEX. R. EVID. 1005 (emphasis added).

Here, the first page of the exhibit, entitled "Certified Motor Vehicle Record Request Response," identifies Menchaca as the vehicle's owner. At the bottom of this page, a box is checked next to the following language:

Certification:
[x] The data included in this document represents the current duly recorded information regarding this motor vehicle at the time of inquiry. This is to certify that this document contains true and correct information as shown by the Vehicle Titles & Registration Division of the Texas Department of Motor Vehicles.

The second page of the exhibit is a form signed by Frances Alvarado, Custodian of Records, Texas Department of Motor Vehicles, which states, "I, Frances Alvarado, do hereby certify that I am a Custodian of Records for the Texas Department of Motor Vehicles and that the information shown on the attached:"

[x]  Title History produced from our current files:
Document/Title Number 01501141802122731 Pages 1 Through 13 . . .
is, to the best of my knowledge, a true and correct copy of records on file with this department.

The next thirteen pages of the exhibit all demonstrate Menchaca's ownership of the vehicle. We conclude the State's exhibit was self-authenticating under the requirement of Rule 902(4) and thus the requirements of Rules 901 and 1005 were satisfied. *See Tex. Dep't of Pub. Safety v. Guajardo*, 970 S.W.2d 602, 608-09 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (concluding certification satisfied the requirement of Rule 902(4) and thus the requirements of Rules 901 and 1005).

**PHOTOGRAPHS OF BROOKE'S INJURIES**

Seventeen photographs were introduced during Brooke's testimony about injuries she sustained when Menchaca assaulted her the evening of April 17th. In his fifth issue, Menchaca asserts the trial court erred by admitting the photographs into evidence. On appeal, Menchaca argues the photographs are cumulative of Brooke's testimony and have no probative value. He contends the photographs were introduced by the State for the sole purpose of inflaming the jury.

"The admissibility of a photograph is within the sound discretion of the trial judge." *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). "Generally, a photograph is admissible if verbal testimony as to matters depicted in the photographs is also admissible. *Id.* "In other words, if verbal testimony is relevant, photographs of the same are also relevant." *Id.* "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401. "A visual image of the injuries appellant inflicted on the victim is evidence that is relevant to the jury's determination." *Gallo*, 239 S.W.3d at 762. "The fact that the jury also heard testimony regarding the injuries depicted does not reduce the relevance of the visual depiction." *Id.*

Rule of Evidence 403, on the other hand, allows for the exclusion of otherwise relevant evidence when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403. "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Gallo*, 239 S.W.3d at 762. "A court may consider several factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice, including, "but are not limited to: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, and

whether the body depicted is naked or clothed." *Id.* "The availability of other means of proof and the circumstances unique to each individual case must also be considered." *Id.*

Menchaca was alleged to have caused Brooke serious bodily injury by striking her, putting his hand in her mouth, pushing her, throwing her to the ground, and choking her. The photographs are of Brooke in a hospital bed wearing a hospital gown and depict bruises, cuts, and scrapes to her face, arms, and legs. Some of the photographs are close-ups of an injury, others are from a distance, all are average in size and in color, and none are gruesome. We conclude the probative value of the exhibits was not substantially outweighed by any cumulative effect or by the danger of unfair prejudice. *See Smith v. State*, No. AP-75,793, 2010 WL 3787576, at *18 (Tex. Crim. App. Sept. 29, 2010) (per curiam) (not designated for publication) (holding probative value of photos depicting victim's injuries was not substantially outweighed by any cumulative effect when they aided theories relevant to the State's case); *Williams v. State*, 301 S.W.3d 675, 692 (Tex. Crim. App. 2009) (holding photographs had probative value when they depicted the victim's injuries). Because we cannot say the trial court abused its discretion in determining the photographs were genuinely helpful in determining Brooke's injuries, or that their probative value outweighed their prejudicial effect, we overrule Menchaca's fifth issue.

## PHOTOGRAPHS OF MENCHACA'S TRUCK AND ITS CONTENTS

In his seventh issue, Menchaca asserts the trial court erred by admitting into evidence fifteen photographs of a truck and its contents.

At trial, the State called Steven Faz, a former Atascosa County Sheriff's Deputy, to testify about the night Brooke was assaulted. Faz said he assisted in a search of the area after Brooke told him Menchaca had run away into the woods behind AJ's house. Driving around the area, he later found a black Dodge truck parked in a vacant lot or field. The truck matched the description Brooke gave of Menchaca's truck. No one was in the truck, but Menchaca's brother, Devyn

Menchaca, was found hiding nearby. When the State attempted to introduce Faz's body camera footage from the night he found the truck and Devyn, defense counsel objected to the relevancy of anything involving Devyn's arrest. The trial court sustained the objection with regard to Devyn's arrest, informing the prosecutor, "[y]ou can prove to the jury that [Menchaca's] brother was out there with the truck waiting for him, but the arrest of his brother is not relevant to this prosecution."

The State later called Mari Kaufman, a lieutenant with the Jourdanton Police Department, to testify about her going to the scene of the assault. She explained, "I arrived and met with Officer Rios. I asked him what happened again. He told me that there had been a break-in into the house and that the victim [Brooke] had stated that Emery Menchaca broke into the house, chased her out of the house and assaulted her on the street but he was still at large."

The State then attempted to introduce into evidence the photographs taken by Kaufman the next day during daylight hours of the truck and the scene where the truck was found. Defense counsel objected as follows:

> Counsel: This evidence of this – these pictures of the truck certainly is [sic] cumulative, repetitive. They've already had testimony that the truck was found, the description of the truck. This is the vehicle that was seized as part of the arrest of Devyn.
> Again, this is involving the arrest of – Devyn's arrest and the truck that he was found with, which they've already testified to at this point. I'm concerned about the cumulative effect of this. It's probative and prejudicial. It's far more prejudicial and [sic] probative, as the evidence of the vehicle has already been introduced.
> And I certainly don't want to be opening doors as to what was in this vehicle involving the crime or the arrest of Devyn, which we've already kept out. And they've already testified about this truck.
>
> Court: So your objection is based on relevancy? Is that what it is?
>
> Counsel: Relevance. It's cumulative. It's more prejudicial than probative. They already have evidence, by testimony, of this vehicle. And it's also part of the arrest of Devyn and the seizure of the vehicle, the result of Devyn. And this involves an extraneous offense of the potential of maybe a co-defendant, I guess.
> But it's far more prejudicial than probative. It's cumulative and involves extraneous offense, and they've already introduced this evidence.

Court:  I overrule your objection based upon cumulative and the fact that the prejudicial effect would outweigh the probative value.

What about relevance, Mr. Thornton [prosecutor]?

Prosecutor:  Judge, I could go over each of the photographs if you like, but the witness testimony is about the type of the truck.  Some of the pictures show that.

The identification of the truck is going to be corroborated with a certified registration I'm about to offer to show that it belonged to [Menchaca].  That's also the purpose of the picture showing the insurance card.

There's also photographs in there showing mud and it was muddy that night and them going through the – going through the mud to get there and then hiding in the truck.  It corroborates that.

There's also a photo –

Court:  How does she [Kaufman] know where the truck was parked in the field? Did she go to the scene?

Prosecutor:  She did go to scene, Judge, yes.

And so there's also photographs of a bloody cloth and a bloody glove that were tested.  The glove was tested for DNA, which we're going to present evidence it came back to both [Menchaca] and [Brooke] in the case.  So those photographs are relevant to place [Menchaca] in the truck and then also to – to show that he was present at the scene when the – when he assaulted her and got the blood on those two items.

So that's the purpose of each one of those photos, Judge.

Court:  I'm not sure what the registration sticker has to do with anything, but unless you're going to – no.  It doesn't have the VIN on it.

But, you know, there's enough evidence – for instance, the truck; he had a big truck, it made a lot of noise, it was jacked up and had this and that on it.  So, I mean, this is just – that's the description, and then these photos show that's what the truck looked like that was in the field.

So I don't think it's cumulative.  I mean, it's not cumulative.  I think it's all relevant, so I'm going to overrule your objection to Exhibits 63 through 77. They're admitted into evidence.

On appeal, Menchaca asserts the photographs (1) allude to extraneous offenses allegedly committed by him and (2) are not relevant.  We do not address the merits of either complaint for two reasons.  First, at trial, defense counsel did not raise an objection regarding possible extraneous offenses committed by Menchaca.  He only objected to "an extraneous offense of the potential of maybe [Devyn] a co-defendant, I guess."  Menchaca's second complaint on appeal is that because the photographs "went to extraneous offenses [allegedly committed by Devyn] that had already

been kept out of the jury's view given their extraneous nature, and they were not relevant to any element of the crime for which [Menchaca] was on trial . . . they contained no probative value, while painting [Menchaca] as a violent criminal." However, the only relevancy objection raised at trial was regarding Devyn's alleged extraneous offenses. Defense counsel did not object that the photographs were not relevant to Menchaca's alleged offenses.

To preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. TEX. R. APP. P. 33.1(a)(1)(A); *Montelongo*, 623 S.W.3d at 822. If the complaint made on appeal does not comport with the complaint made in the trial court, the complaint is not preserved for consideration on appeal. *See Gibson v. State*, 541 S.W.3d 164, 166 (Tex. Crim. App. 2017); *Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004); *Gonzalez-Gallegos v. State*, No. 04-19-00835-CR, 2021 WL 799892, at *1 (Tex. App.—San Antonio Mar. 3, 2021, no pet.) (mem. op., not designated for publication). Menchaca's complaints on appeal do not comport with his objections at trial; therefore, he did not preserve his seventh issue on appeal.

**TESTIMONY OF FORENSIC ANALYST**

In his ninth issue, Menchaca asserts the trial court erred by admitting into evidence an exhibit and the testimony of Jennifer Trevino, a forensic analyst from the Texas Department of Public Safety Crime Laboratory ("DPS") in Corpus Christi. During her testimony, the State offered into evidence the forensic report Trevino prepared regarding her DNA analysis of blood samples. Defense counsel objected to Trevino's qualifications and the State asked her several questions about her background and training. Defense counsel again objected that "the testimony of this witness has [not] shown that she is an expert and competent to interpret this data." The trial court overruled the objections. On appeal, Menchaca argues Trevino was not qualified to

"interpret" the exhibit with DNA results, and she should not have been allowed to give an expert opinion at trial.

"The Texas Rules of Evidence set out three separate conditions regarding admissibility of expert testimony." *Vela v. State*, 209 S.W.3d 128, 130 (Tex. Crim. App. 2006). First, Rule 104(a) requires the court to "decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible." TEX. R EVID. 104(a). Second, Rule 702 states: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." *Id.* 702. Third, Rule 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." *Id.* 401.

"These rules require a trial judge to make three separate inquiries, which must all be met before admitting expert testimony: '(1) the witness qualifies as an expert by reason of [her] knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case.'" *Vela*, 209 S.W.3d at 131 (citation omitted). "These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance." *Id.* Only the first condition is at issue in this appeal. On appeal, Menchaca does not explain his basis for contending Trevino was not qualified.

Trevino testified she had worked as a forensic analyst for the past five years at DPS. She has a bachelor-of-science degree from Texas A&M University Corpus Christi with an emphasis in forensic science. She had undergone additional DNA analysis training with DPS, and completed eight hours of continuing education annually. At the time of trial, she had been doing DNA

analysis for two years. She was a member of the Association of Forensic Analysts and Administrators. When asked about specific training she received to be able to interpret data for DNA analysis, she replied:

> So I underwent an in-house, modular-based training on all the sections of DNA analysis, including serology, DNA testing and interpretation. Each module consisted of readings, tests, competency tests, practice sets and independent exercises before I could move on to the next section.
> . . .
> So on the specific DNA testing, I do have training in DNA testing. Also, in interpretation, I went through the same modular-based training as I did in the other sections of DNA comparisons.

When asked whether she had any training that enabled her to analyze the data presented to her, she replied:

> Yes, I did. . . . So with those, I was presented mock cases. I was presented mock profiles so that I was able to see different profiles, see different ways of doing interpretation. I was also given a mock trial to also ensure that I was competent.

In her five years with DPS, she testified as a DNA analyst expert "a few times." She stated the lab where she works is accredited by the American National Standards Institute National Accreditation Board, and to be an analyst at the lab, she must take a proficiency test biannually, which is peer-reviewed. She explained that a "proficiency test is just to ensure that the analyst is competent in the methods used in our laboratory." In her career, she has tested over 500 DNA samples for analysis, done interpretation on over 100 cases, and testified as an expert in two cases.

The mere fact that a witness—such as Trevino—possesses knowledge and skill not possessed by people generally does not in and of itself mean that such expertise will assist the trier of fact regarding the issue before the court. *See Vela*, 209 S.W.3d at 131. A witness will not always qualify as an expert merely by virtue of a general background. *Id.* Accordingly, qualification is a two-step inquiry: (1) a witness must first have a sufficient background in a particular field, but (2) a trial judge must then determine whether that background goes to the very

matter on which the witness is to give an opinion. *Id.* The focus, then, is on the "fit" between the subject matter at issue and the expert's familiarity therewith. *Id.* at 133. Just as the subject matter of an expert's testimony should be tailored to the facts of a case, the expert's background must be tailored to the specific area in which the expert desires to testify. *Id.* Here, the State established that Trevino's education, training, and work experience qualified her to testify reliably about DNA testing and analysis. *See id.* at 131. Therefore, we conclude the trial court did not err by overruling Menchaca's objection to Trevino's testimony. Accordingly, we overrule Menchaca's ninth issue.

## TESTIMONY OF JENNIFER FERNANDEZ

In his tenth issue, Menchaca asserts the trial court erred by admitting into evidence the testimony of Jennifer Fernandez, Executive Director of the Guadalupe Family Violence Shelter. The State asked the following question:

> Q. In a relationship that involves this cycle of violence, if the victim decided to leave that relationship and – and began – begun going through a divorce, does research, in your experience, show that that's a particularly dangerous time?
> A. Yes.
> Q. And why is that?
> A. The time that a victim is attempting to leave and –

Defense counsel raised the following objection: "Again, Your Honor, I'm going to re-urge this objection as it relates to *pure speculation on hypothetical scenarios* that are not connected to the facts of this case whatsoever." [Emphasis added.] The trial court overruled the objection.

On appeal, relying on the caselaw he cited in issue nine, Menchaca complains "Fernandez was *not qualified to testify* as to her speculative opinion as to the cycle of violence . . . and she should not have been permitted to [provide] speculative opinion at this stage of trial." [Emphasis added.] Menchaca also asserts her testimony was not reliable. Menchaca's complaints on appeal do not comport with his objection at trial; therefore, he did not preserve his tenth issue on appeal.

## TESTIMONY REGARDING THE MISDEMEANOR CONVICTIONS
## OF MENCHACA'S MOTHER

In his eleventh issue, Menchaca asserts the trial court erred by allowing the State to introduce evidence, during the punishment phase of trial, regarding his mother's misdemeanor convictions. Defense counsel called Menchaca's mother, Michelle Ortiz, to testify. She described her son as a good father, and she asked the jury to give her son an opportunity to return to his children, to live a functional life, and for her to help him. She said she herself had been a victim and she did not "condone it." On cross-examination, the State asked her whether she believed in violence:

> Q. Okay. Do you recall the conversation you had with Brooke where you told her that you have been a victim of abuse in your relationship?
> A. She knows I have.
> Q. Right, and did you also tell her that sometimes when you love a man, that it's your responsibility to take it?
> A. No. I've never had that conversation with her. Absolutely not.
> Q. And that that's a woman's duty in a relationship?
> A. That's a hear – no. No, sir. I don't believe in that.
> Q. Okay.
> A. I would never ask her – I would never talk to her about something like that.
> Q. You don't believe in violence is what you said?
> A. No, I don't. I would never – I would never condone for her to be hit or anybody hit, not even myself.

The State then asked to introduce evidence that Ortiz had twice previously pled guilty to family violence misdemeanors, one in 2002 and another in 2019. Defense counsel objected that the two convictions were too far out-of-date and more prejudicial than probative. The State contended it wanted to introduce the misdemeanors because they were crimes of moral turpitude and to impeach Ortiz ("It's an impeachment not with a conviction but with proof of the opposite of what she's testified to."). The trial court overruled the objections. The State asked Ortiz about the two misdemeanors and she explained the circumstances. Neither party referred to the misdemeanors in closing arguments.

On appeal, Menchaca asserts the misdemeanors were used as evidence of Ortiz's bad character and were more prejudicial than probative. Menchaca does not contend, much less explain, how he was harmed. Assuming without deciding that it was error to admit the testimony, we hold the evidence was not unfairly prejudicial. When a trial court commits non-constitutional error, we ask whether the error affected the defendant's substantial rights. TEX. R. APP. P. 44.2(b) ("Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002) (same). In determining whether the defendant's substantial rights were harmed, we look at the entire record, including all testimony and physical evidence, the character of the error and how the jury might have taken it in light of the other evidence, jury instructions, the State's theory and arguments, and any defensive theories. *Motilla*, 78 S.W.3d at 355-56.

During the guilt-innocence phase, the jury heard evidence about Menchaca's and Brooke's abusive relationship and about the violent nature of the assault committed by Menchaca on the night of the incident. During the punishment phase, the State spent little time on the two misdemeanors and Ortiz was allowed to explain. The State did not mention the misdemeanors in its closing argument. In light of the entire record and the substantial evidence against Menchaca, we have a fair assurance that the complained-of error did not have a substantial and injurious effect or influence in determining the jury's decision regarding punishment. Therefore, we overrule his eleventh issue.

### PREJUDICIAL NATURE OF TESTIMONY REGARDING MENCHACA'S EXTRANEOUS OFFENSES

In his twelfth and final issue, Menchaca asserts the trial court erred by admitting into evidence, during the punishment phase of trial, hearsay testimony regarding his alleged extraneous offenses. During the State's cross-examination of Ortiz, the following exchange occurred:

Q. And in fact you've been witness numerous times to violence that [Menchaca] has committed against other people, have you not?
A. No, sir.
Q. Okay. Just a second.
What – do you ever – did you ever live on Denado Road?
A. Yes, sir.
Q. Do you recall the police coming out to an incident where Morgan and [Menchaca] beat up your boyfriend?

[defense objection overruled]

Q. Just one moment, Your Honor.
Well, let's – let's talk about the one incident where you called or where you spoke to the police about Morgan and [Menchaca] fighting each other over a pool game in Poteet. Do you remember that?

[defense objection overruled]

. . .

Q. Now, do you recall an incident in 2016 where Devyn, [Menchaca], and Morgan attacked Brian, your – Brian Escalante I think was your boyfriend at the time?
A. Yes.
Q. And you told the officer that all three of your boys attacked Brian. Right?
[defense objection overruled]
Q. Did – did – did you ever say that your three boys attacked Brian?

[defense objection overruled]

Q. Did you ever say that?
A. Yes, sir. He was – because Brian was beating me up.

On appeal, Menchaca asserts the hearsay evidence of his alleged extraneous offenses was highly prejudicial because it went directly to allegations that he was abusive and assaultive.

Assuming without deciding that it was error to admit the testimony, we hold the evidence was not unfairly prejudicial for the same reasons as above in issue eleven. In light of the entire record and the substantial evidence against Menchaca, we have a fair assurance that the complained-of error did not have a substantial and injurious effect or influence in determining the jury's decision regarding punishment. Therefore, we overrule his twelfth issue.

## CONCLUSION

We affirm the trial court's judgment.

Lori I. Valenzuela, Justice

Do not publish